IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 1:22-CR-75 |
| AKSHAY RAM KANCHARLA, | The Honorable Michael S. Nachmanoff |
| *Defendant*. | Sentencing: August 4, 2022 |

## UNITED STATES' POSITION ON SENTENCING

The United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, Bibeane Metsch, Assistant United States Attorney, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or the "Guidelines"), hereby files this position of the United States with respect to sentencing of the defendant, Akshay Ram Kancharla.  The defendant comes before the Court for sentencing after pleading guilty to a one-count Criminal Information charging distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1).  The government has no objection to the Probation Office's calculation of the defendant's Guidelines of 188 to 235 months (total offense level 36; criminal history category I), as set forth in the Presentence Investigation Report ("PSR"), (Dkt. No. 39), in paragraphs 52 to 62.

For the reasons set forth herein, the United States respectfully submits that a below-Guidelines sentence of 87 months of imprisonment is appropriate in this case.

## BACKGROUND

In October 2021, federal agents began conducting a criminal investigation of a darknet market ("DM") vendor operating under the moniker "OnlyTheFinest." PSR ¶ 14. A DM is a hidden commercial website that functions as a "black market" where vendors sell and broker transactions

involving legal products, as well as drugs, weapons, counterfeit currency, and other contraband. PSR ¶ 15. In October 2021, the Federal Bureau of Investigation ("FBI") reviewed a vendor profile for OnlyTheFinest on a DM known as ToRReZ. PSR ¶ 17. The profile had several listings for varying quantities of counterfeit pills—Oxycodone, Xanax, and Adderall—as well as THC resin. PSR ¶ 17. Within the product description for the Oxycodone pills, the vendor wrote:

> THESE M30 BLUES ARE VERY POTENT! PLEASE START WITH A SMALL DOSAGE BEFORE WORKING YOUR WAY UP PLEASE! Even if you think your tolerance is high. These are smokable, snortable, injectable and everything in between.

PSR ¶ 17.

Beginning in early October 2021, law enforcement conducted a series of undercover drug purchases from OnlyTheFinest using the DM ToRReZ and via Wickr (an encrypted communications platform accessed using one's cell phone). PSR ¶¶ 18, 20, 23, 39. The agents paid with Bitcoin after providing an address in northern Virginia, within the Eastern District of Virginia, where OnlyTheFinest could mail the narcotics. PSR ¶ 18. Counterfeit Oxycodone pills purchased from OnlyTheFinest tested positive for the presence of fentanyl. PSR ¶ 39.

On December 17, 2021, the DM ToRReZ closed and OnlyTheFinest shifted their business to the DM Dark0de Reborn. PSR ¶ 32. At the time of the closure, OnlyTheFinest had completed at least 264 transactions on ToRReZ for several items including 7,375 pressed Oxycodone pills sold for a total of $63,016. PSR ¶ 41. Using Dark0de Reborn, the defendant sold at least 3,975 counterfeit Oxycodone pills for which he was paid $28,137. PSR ¶ 42.

On February 17, 2021, law enforcement executed a search warrant on the defendant's residence. Therein, law enforcement found counterfeit Oxycodone pills (weighing approximately 2.38 kilograms) resembling those obtained through the controlled purchases as well as counterfeit

2

Xanax pills (weighing approximately 437.5 grams). PSR ¶ 43. Law enforcement also seized approximately $30,410 in U.S. currency and observed on the defendant's laptop a cryptocurrency wallet containing approximately 2.44 Bitcoin. PSR ¶ 43.

The defendant was arrested that day in Tampa, Florida before being released on bond. PSR ¶ 9. Immediately after his initial appearance before this Court on February 28, 2022, the defendant attempted to use Wickr to sell the same counterfeit Oxycodone pills to an undercover agent who he previously sold to as part of this investigation. PSR ¶ 12. Based on that information, this Court issued a warrant for the defendant's arrest and he was remanded. PSR ¶ 12. On March 26, 2022, the defendant pleaded guilty to distribution of fentanyl. PSR ¶ 12. The defendant is set to be sentenced on August 4, 2022.

## SENTENCING ANALYSIS

### I. Law

A sentencing court must review the appropriate Guidelines range in conjunction with the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). Although the Guidelines are advisory, district courts are required to "consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264 (2005). Under the required procedures, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). In doing so, "the district court must make and place on the record an individualized assessment based on the particular facts of the case." *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009).

3

Section 3553(a) requires district courts to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Paragraph 2 lists four purposes for a sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition to the purposes of sentencing listed in Section 3553(a)(2), a sentencing court must also consider: (1) the nature of the offense and the defendant's history and characteristics; (2) the kinds of sentences legally available; (3) the advisory sentencing range provided by the Sentencing Guidelines; (4) any relevant policy statement issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities; and (6) the need for restitution. 18 U.S.C. § 3553(a).

**II.     Guidelines Calculation**

The Probation Office has appropriately calculated a total offense level of 36 and criminal history category of I. PSR ¶¶ 62, 66. The base offense level based on drug quantity and converted drug weight is 32, as stipulated in the defendant's plea agreement, which is described in paragraph 3 of the PSR. PSR ¶¶ 3, 52. Two points are added to the offense level because the defendant distributed a controlled substance through mass-marketing by means of an interactive computer service pursuant to U.S.S.G. § 2D1.1(b)(7). PSR ¶ 53. Four points are added under U.S.S.G. § 2D1.1(b)(13) for knowingly misrepresenting or marketing as another substance a mixture or substance containing fentanyl. PSR ¶ 54. The defendant is eligible for a two-level safety valve

reduction because he meets the criteria set forth in subdivisions (1)-(5) of subsection (a) of U.S.S.G. § 5C1.2.

If the Court finds that the defendant is entitled to a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), in accordance with the plea agreement, the government hereby moves for the additional one-point reduction under § 3E1.1(b). PSR ¶ 4. Assuming no points are deducted for acceptance of responsibility, the defendant's total offense level of 36 and criminal history category of I yields an advisory Guidelines range of 188 to 235 months. PSR ¶ 93. The statutory maximum sentence for a violation of 21 U.S.C. § 841(a)(1) is 20 years of imprisonment. 21 U.S.C. § 841(b)(1)(C).

      i.     The Two-Level "Mass-Marketing" Enhancement Applies

Based on discussions with defense counsel, the government anticipates an objection to the application of the two-level "mass-marketing" enhancement pursuant to U.S.S.G. § 2D1.1(b)(7). The Court should apply the two-level enhancement because by selling counterfeit pills on ToRReZ and Dark0de Reborn, the defendant "distributed a controlled substance through mass-marketing by means of an interactive computer service." U.S.S.G. § 2D1.1(b)(7).

Application note 13 of the commentary to § 2D1.1 clarifies that "for purposes of subsection (b)(7), 'mass-marketing by means of an interactive computer service' means the solicitation, by means of an interactive computer service, of a large number of persons to induce those persons to purchase a controlled substance."[1] The defendant's admitted conduct of advertising counterfeit Oxycodone, Xanax, and Adderall pills on two dark net websites, which he then sold and shipped

---

[1] The application note then gives the example of a "defendant who operated a web site to promote the sale of" controlled substances. U.S.S.G. § 2D1.1, cmt. n.13.

to undercover FBI agents in this District, constitutes solicitation of a large number of people to purchase illegal drugs.

Sites like ToRReZ and Dark0de Reborn, despite operating on the dark web, are "interactive computer services" for purposes of the statute. *See Henderson v. Source for Public Data*, 540 F. Supp. 3d 539, 547 (E.D. Va. 2021) ("interactive computer services" are websites that do not generate original content but rather allow users to access the website in order to post information). The term "interactive computer services" has the meaning given to that term in 47 U.S.C. § 230(f)(2). U.S.S.G. § 2D1.1, cmt. n.13. Section 230(f)(2) defines an "interactive computer service" as any "information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" That definition encompasses dark net websites of the sort used by the defendant. When active, ToRRez and Dark0de Reborn were accessible to anyone who wished to visit or use the sites. In any event, there is no requirement in the Guidelines or in section 230(f)(2) that the "interactive computer service" be accessible to every user, on every internet browser, on every computer. Nor does the defendant have to have operated the website himself for the enhancement to apply. *See United States v. Glarner*, No. 19-50293, 2021 WL 4926113, at *2 (9th Cir. Oct. 21, 2021) ("The fact that [the co-conspirator] did not operate an entire website does not undermine his active use of an interactive computer service.").

Courts have applied this enhancement in cases involving the sale of narcotics through the dark net. *See id.* at *2 (affirming application of the enhancement where the defendant's co-conspirator used a vendor account on a dark net website to make over 1,500 illicit drug sales). Courts have also applied this enhancement to individuals advertising narcotics on Facebook which is analogous to posting on a dark net site as in this case. *See United States v. Perez*, 840 F. App'x

6

792 (5th Cir. 2021) (per curiam) (district court did not err in applying "mass-marketing" enhancement where the defendant used Facebook and Facebook messenger to solicit customers to purchase illegal drugs); *United States v. Martinez*, 823 F. App'x 284 (5th Cir. 2020) (per curiam) (holding that the district court did not commit clear error in applying the "mass-marketing" enhancement where the defendant posted on Facebook that she had "bags" of synthetic cannabinoid available). Like on Facebook, users who visit ToRRez or Dark0de Reborn find a virtual marketplace that allows buyers and sellers to conduct transactions online.

Accordingly, the government submits that the two-level "mass-marketing" enhancement should be applied in this case.

    ii.  <u>The Four-Level Enhancement for "Misrepresenting" Fentanyl Applies</u>

The government also anticipates an objection by the defense to the four-level enhancement for misrepresenting or knowingly marketing as another substance a mixture or substance containing fentanyl. *See* U.S.S.G. § 2D1.1(b)(13)

According to a report of the defendant's February 17, 2022 interview with law enforcement, the defendant stated that he had "never tested the pills for fentanyl, but he thought they probably had fentanyl in them because it was common for fake oxycodone to have fentanyl in them." As acknowledged by the defendant himself on the day of his arrest, it is well known that counterfeit Oxycodone often contains fentanyl. In addition, the defendant's listing for the counterfeit pills described them as "VERY POTENT," which further corroborates the conclusion that he knew the pills contained fentanyl which is known to be very potent. PSR ¶ 17. For these reasons, the government submits that the preponderance of the evidence supports a finding that

7

the defendant did know the pills contained fentanyl and he knowingly misrepresented this fact. Therefore, the four-level enhancement does apply in this case.

### III. Section 3553(a) Analysis

After a careful consideration of the § 3553(a) sentencing factors, the government respectfully submits that a below-Guidelines sentence of 87 months is appropriate but not greater than necessary in this case. The government derived its recommendation by considering an advisory Guidelines range that includes a three-level reduction for acceptance of responsibility and excludes the six-level increase triggered by the "mass-marketing" and "misrepresenting fentanyl" enhancements. The resulting calculation leads to an overall offense level of 27, which when combined with a criminal history category of I, yields a Guidelines range of 70 to 87 months of imprisonment. The government's 87-month recommendation falls at the top of this Guidelines range and takes into account the defendant's cooperation with the government in the investigation and prosecution of this case, as well as his youth and lack of previous criminal convictions.

Of the sentencing purposes described in 18 U.S.C. § 3553(a)(2), paramount in this case is the need for the defendant's sentence to afford adequate specific deterrence and to reflect the seriousness of fentanyl-related crimes. The defendant distributed and possessed a significant quantity of deadly fentanyl-laced pills, endangering people in this community and across the nation. Fentanyl is a highly addictive drug with high rates of abuse that has the potential to destroy families, homes, and communities. Most recent cases of fentanyl-related overdoses and deaths in the United States are linked to illegally made fentanyl—like the pills distributed by the defendant—that is often sold through illegal drug markets with or without the user's knowledge.[2]

---

[2] Centers for Disease Control and Prevention, *Fentanyl*, *available at*

As a result, many overdose victims die after unknowingly ingesting fentanyl.[3] The scope of the fentanyl epidemic is staggering—last year, there were more deaths in the United States caused by fentanyl than gun- and auto-related deaths combined.[4] The defendant's conduct had the potential to contribute to that growing tally.

The defendant knew that his counterfeit product could kill or at least seriously harm its users. The "M30 BLUES" that he sold on ToRReZ, Dark0de Reborn, and Wickr were misrepresented as prescription strength Oxycodone. Each of the pills had "M" stamped on one side and "30" on the other. PSR ¶ 18. Pharmaceutical grade Oxycodone pills have the exact same appearance, with the "30" indicating a 30-milligram dose. PSR ¶ 18. But the defendant was aware that the pills—because they actually contained fentanyl—were in fact more potent than authentic pharmaceutical grade Oxycodone. He encouraged buyers to begin with a small dosage, even if they had a high tolerance. PSR ¶ 17. Nevertheless, he emphasized that the pills "are smokable, snortable, injectable and everything in between." PSR ¶ 17. It is clear based on the volume of pills sold by this defendant that he knowingly disregarded the risk that any one of the thousands of pills that he sold could not only kill its user, but also irreparably harm families and communities across the country.

It is vital in this case to send a message of specific deterrence to this defendant. This is particularly true here where, after being confronted with the seriousness of his conduct at his initial appearance in this District, the defendant immediately chose to continue attempting to sell

---

https://www.cdc.gov/opioids/basics/fentanyl.html (last visited July 20, 2022).
[3] Drug Enforcement Administration, *DEA Warns of Increase in Mass-Overdose Events Involving Deadly Fentanyl*, *available at* https://www.dea.gov/press-releases/2022/04/06/dea-warns-increase-mass-overdose-events-involving-deadly-fentanyl (last visited July 20, 2022).
[4] *Id.*

9

narcotics to an undercover agent. PSR ¶ 12. A substantial prison term is necessary to send a message to him—and to others who are engaging in similar illicit transactions—that such behavior will not be tolerated.

While the nature of the offense is very serious, the defendant's history and characteristics weigh in favor of a below-Guidelines sentence in this case. The defendant laudably has a relatively limited criminal history. He does not have any previous convictions, and his three state-level arrests—two on marijuana-related charges and one for petit theft—occurred over six years ago. PSR ¶¶ 64, 69-71. He is 26 years old and is supported by his parents, both of whom have indicated that they will do whatever it takes to ensure his successful transition back into society. PSR ¶ 72. The defendant reported that he has struggled with mental illness and substance abuse. PSR ¶¶ 79, 80. The defendant's history with drugs began around the age of 16 when he started using marijuana. PSR ¶ 80. He later abused Xanax and used promethazine with codeine cough syrup before stopping after a suspected overdose. PSR ¶ 80.

The government recognizes the mitigating factors in this case; however, the defendant ultimately squandered his opportunity to begin his adult life as a law-abiding contributor to society. The defendant's background reveals that he grew up in a "fairly normal," two-parent household. PSR ¶ 74. He received good grades in high school and earned an associate's degree in music production in 2018. PSR ¶¶ 75, 82. He had fairly regular employment up until his arrest earlier this year. PSR ¶¶ 86-88. Specifically, at various times he worked as a freelance music producer, a technical and paraprofessional at the University of South Florida, and an assistant at a granite supply warehouse. PSR ¶¶ 86-88. The defendant had ample opportunity to pursue legitimate professional ends, but instead, he succumbed to the lure of quick and easy money selling highly

addictive pills. Accordingly, the 3553(a) factors warrant a substantial sentence of 87 months of imprisonment.

## CONCLUSION

For the reasons stated herein, the United States submits that a sentence of 87 months of imprisonment is sufficient but not greater than necessary to satisfy the sentencing factors in 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Bibeane Metsch
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2022, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send electronic notification of such filing to counsel of record in this case; and I will further forward an electronic copy to the U.S. Probation Officer assigned to the case.

/s/
Bibeane Metsch
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700
Fax: 703-299-3982
Email: bibeane.metsch@usdoj.gov